# UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| JOSE HERNANDEZ,<br><br>    Petitioner,<br><br>    v.<br><br>PATRICK COVELLO,<br><br>    Respondent. | Case No. 1:24-cv-00475-JLT-SAB-HC<br><br>FINDINGS AND RECOMMENDATION RECOMMENDING DENIAL OF PETITION FOR WRIT OF HABEAS CORPUS |

Petitioner is a state prisoner proceeding pro se with a petition for writ of habeas corpus pursuant to 28 U.S.C. § 2254.

**I.**

**BACKGROUND**

On February 7, 2019, Petitioner was convicted by a jury in the Merced County Superior Court of three counts of first-degree robbery. (1 CT[1] 243–45.) On April 13, 2021, Petitioner was sentenced to an imprisonment term of sixty-four years to life. (2 CT 394.) On November 18, 2022, the California Court of Appeal, Fifth Appellate District affirmed the judgment. People v. Hernandez, No. F082679, 2022 WL 17076562 (Cal. Ct. App. Nov. 18, 2022). On January 25, 2023, the California Supreme Court denied the petition for review. (LD[2] 17.)

---

[1] "CT" refers to the Clerk's Transcript on Appeal lodged by Respondent. (ECF No. 10.)
[2] "LD" refers to the documents lodged by Respondent. (ECF No. 10.)

1

On April 22, 2024, Petitioner filed a petition for writ of habeas corpus challenging his convictions on the grounds of ineffective assistance of counsel. (ECF No. 1.) On June 21, 2024, Respondent filed an answer. (ECF No. 11.) On July 12, 2024, Petitioner filed a reply. (ECF No. 12.)

## II.

## STATEMENT OF FACTS[3]

> On the night of August 1, 2014, defendant, William White, Victor Hernandez, and Orlando Yepez entered a house and robbed Juan A.[4] and Gloria of drug money. . . .
>
> . . .
>
> **I. Events Leading Up to the Offense**
>
> On the night of July 31, 2014, William White and Tiffany R. drove in a white Mercedes Benz to Modesto. After arriving in Modesto, William spoke with his friend, defendant, while Tiffany remained in the car. A month before, William had told Tiffany defendant owed him some money. William and defendant then got into the car and drove to a liquor store. Subsequently, they drove to a location nearby and defendant's younger brother[5] got in the back seat with defendant. The group drove through a rural area and eventually stopped next to a black BMW car with dark tinted windows. Defendant exited the car and got into the BMW and came back with a black backpack. The car and the BMW were driven together and stopped in a residential area with "[r]eally big houses." Defendant and William exited the car and walked around the corner, while defendant's little brother eventually moved from the back seat into the driver's seat. Before William left, he told Tiffany, " 'I'll be back in a few minutes. I love you.' "
>
> **II. The Offense**
>
> In July of 2014, Juan A. lived alone in a house in Hilmar, but his girlfriend Gloria, who he had been dating for two or three years, stayed with him. Juan testified under a "use immunity" agreement that on the night of July 31, 2014, he just got back from Sacramento with either $10,000 or $12,000 in drug money and placed the money on the kitchen counter.[6] A half-hour to one hour later, Gloria watched television while Juan made a sandwich when Victor Hernandez and Orlando Yepez[7] arrived unannounced at the house and knocked on the door. Juan testified that they both were wearing black. Juan knew both Victor and Orlando from prior

---

[3] The Court relies on the California Court of Appeal's November 18, 2022 opinion for this summary of the facts of the offense and procedural history. See Vasquez v. Kirkland, 572 F.3d 1029, 1031 n.1 (9th Cir. 2009).

[4] Pursuant to California Rules of Court, rule 8.90, we refer to some persons by their first names or initials.

[5] Although defendant's little brother was never identified by name, it appears the litigants may have been referring to "Hugo Hernandez."

[6] Juan admitted he had a lengthy criminal history. Juan was in custody and awaiting extradition to New Jersey to be sentenced on drug-related charges and had pending criminal charges in Stanislaus County at the time of his testimony.

[7] Orlando was also referenced throughout the trial as his nickname "Joe" or "Fat Joe." For purposes of this appeal, we will refer to him as Orlando.

illegal activities. Gloria answered the door and both Victor and Orlando came inside. Juan testified that Orlando observed "how much [money he] would bring home" from selling drugs and he knew Juan was in the drug business. Orlando told Juan he had just been robbed and he tried to convince Juan to go to a hotel to confront the robbers. Orlando also asked Juan whether he had any weapons on him.

At this point, Orlando punched Juan while he was standing near the kitchen counter. Orlando and Juan started fighting and Victor then ran towards Juan with a black handgun. During the struggle, William and defendant ran into the house. Defendant jumped up onto the kitchen counter, while William rushed Gloria with a gun and grabbed her and threw her to the ground. Defendant then stabbed Juan with a screwdriver in the hand and in the back. Juan testified that he suffered stab wounds, scrapes, puncture wounds, and bruising.[8] While they were fighting, Juan heard Victor say, " '[G]et out the way. I'm going to shoot him.' " Juan and Victor then struggled over the gun causing the gun to fire "[a] couple times" towards the kitchen area. Orlando ended up being shot. Juan never saw anyone go into the bedroom.

At or around this time, Tiffany heard "some, like, snap, crack, popping noises from a distance," which she believed were "[e]ither gunshots or fireworks." Defendant's little brother attempted to make a phone call in the car, but nobody answered.

**III. Events After the Offense**

Juan then grabbed the handgun and ran towards the garage and exited the house. He then attempted to bang on his neighbor's doors, but nobody answered. At this point, Juan called 911 and ended up on the side of his neighbor's house. Juan observed Victor looking for defendant, but he ended up getting into a BMW car and leaving the scene.

Subsequently, William sprinted back to the car with a wad of money in his hand and defendant was not with him. William screamed, " '[M]ove, move, move.' " Defendant's younger brother exited the driver's seat, went into the back seat and William entered the driver's seat and drove fast with the headlights turned off. Defendant's younger brother asked William where his brothers were and William responded they were fine, but " 'Gordo' " or " 'Fats' " was most likely not going to make it. Further, William frantically stated, " 'The house lick went bad.' "[9] William ended up dropping off defendant's younger brother at defendant's house and then drove to a gas station. At the gas station, William told Tiffany to remove a piece of paper that covered the entire rear license plate, which she did. Eventually they drove to Concord where Tiffany lived. The next day, William gave Tiffany $400 or $500 in cash for bills.

**IV. Subsequent Law Enforcement Investigation**

Deputy V. LaMattina was dispatched to the Hilmar house and immediately noticed two individuals coming out the house, later identified as Juan and Gloria. Juan appeared very distressed and emotional and bled from his left arm or hand. Deputy LaMattina noticed a "wad or bundle of cash in the middle of the [house's]

---

[8] Detective Sanchez later testified that he did not observe an injury on Juan's back he would characterize as a "stab wound."

[9] Tiffany testified she understood the word " 'lick' " as "street slang for robbery."

lawn." He then swept the house and observed Orlando dead in the kitchen laying on top of a rifle.[10] Further, he noticed "glass shatters all over the living room, spent handgun shells in the living room area ... [and] pools of blood, some of them led ... down the hallway towards the garage" door. He then went back outside and noticed the cash on the lawn was missing. Gloria admitted she picked up the cash and placed it in her pocket, and Deputy LaMattina told her to place it back on the lawn in the general area where it was originally found.

Detective K. Ly testified he took multiple photographs of the scene. During this time, Detective Ly located a footprint on the concrete towards the garage door, which indicated to him the individual who made the footprint wore socks. He also located a rifle underneath Orlando and a .45-caliber handgun near the couch. The handgun had been fired until empty. There were "puffs on the back of [the] couch," which was consistent with a bullet going through the couch. Detective Ly also located nine-millimeter casings indicating two firearms were used.

During the search, officers also located two screwdrivers, one with a shaved tip. Juan identified the nonshaved tip screwdriver as the one possessed by defendant when he entered the home and stabbed him. Both screwdrivers were later tested by the Department of Justice for blood, fibers, fingerprints, and DNA, but no evidence was found. A forensic DNA analyst testified that if someone stabbed another with a screwdriver causing that person to bleed it is "[v]ery likely" DNA evidence would be located on that screwdriver, assuming it was not subsequently cleaned with either bleach or running water.

Detective S. Sanchez then interviewed Juan. Detective Sanchez testified that during the interview it was possible Juan called Orlando a " '[g]reedy mother f[**]king piece of shit.' " Additionally, Juan told Detective Sanchez the money found on the front lawn belonged to Gloria, and he attempted to dissociate himself from the money.[11]

Officers then obtained cell phone records associated with defendant and his brothers. Specifically, the records established defendant's little brother was in the area of Hilmar, within several miles of the crime scene on the night of the incident. During the time of the incident, Orlando and defendant's little brother attempted to call defendant multiple times.

Hernandez, 2022 WL 17076562, at *1–3 (footnotes in original).

## III.

## STANDARD OF REVIEW

Relief by way of a petition for writ of habeas corpus extends to a person in custody pursuant to the judgment of a state court if the custody is in violation of the Constitution or laws or treaties of the United States. 28 U.S.C. § 2254(a); 28 U.S.C. § 2241(c)(3); Williams v. Taylor,

---

[10] A subsequent autopsy established Orlando suffered two gunshot wounds: a nonfatal graze wound on his upper left arm and a fatal wound to his left lung, heart, and liver. Powder burns or gunshot residue around the wound were not found, which would have been indicative of a close-range shot.

[11] Juan also testified that he told law enforcement some of the money in the house belonged to his sister.

4

529 U.S. 362, 375 (2000). Petitioner asserts that he suffered violations of his rights as guaranteed by the U.S. Constitution. The challenged convictions arise out of the Merced County Superior Court, which is located within the Eastern District of California. 28 U.S.C. § 2241(d).

On April 24, 1996, Congress enacted the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), which applies to all petitions for writ of habeas corpus filed after its enactment. Lindh v. Murphy, 521 U.S. 320 (1997); Jeffries v. Wood, 114 F.3d 1484, 1499 (9th Cir. 1997) (en banc). The instant petition was filed after the enactment of AEDPA and is therefore governed by its provisions.

Under AEDPA, relitigation of any claim adjudicated on the merits in state court is barred unless a petitioner can show that the state court's adjudication of his claim:

> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
>
> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d); Harrington v. Richter, 562 U.S. 86, 97–98 (2011); Lockyer v. Andrade, 538 U.S. 63, 70–71 (2003); Williams, 529 U.S. at 413.

As a threshold matter, this Court must "first decide what constitutes 'clearly established Federal law, as determined by the Supreme Court of the United States.'" Lockyer, 538 U.S. at 71 (quoting 28 U.S.C. § 2254(d)(1)). In ascertaining what is "clearly established Federal law," this Court must look to the "holdings, as opposed to the dicta, of [the Supreme Court's] decisions as of the time of the relevant state-court decision." Williams, 529 U.S. at 412. "In other words, 'clearly established Federal law' under § 2254(d)(1) is the governing legal principle or principles set forth by the Supreme Court at the time the state court renders its decision." Id. In addition, the Supreme Court decision must "'squarely address [] the issue in th[e] case' or establish a legal principle that 'clearly extend[s]' to a new context to the extent required by the Supreme Court in . . . recent decisions"; otherwise, there is no clearly established Federal law for purposes of review under AEDPA. Moses v. Payne, 555 F.3d 742, 754 (9th Cir. 2009) (quoting Wright v. Van Patten, 552 U.S. 120, 125 (2008)); Panetti v. Quarterman, 551 U.S. 930 (2007); Carey v.

1  Musladin, 549 U.S. 70 (2006). If no clearly established Federal law exists, the inquiry is at an
2  end and the Court must defer to the state court's decision. Musladin, 549 U.S. 70; Wright, 552
3  U.S. at 126; Moses, 555 F.3d at 760.

4  If the Court determines there is governing clearly established Federal law, the Court must
5  then consider whether the state court's decision was "contrary to, or involved an unreasonable
6  application of, [the] clearly established Federal law." Lockyer, 538 U.S. at 72 (quoting 28 U.S.C.
7  § 2254(d)(1)). "Under the 'contrary to' clause, a federal habeas court may grant the writ if the
8  state court arrives at a conclusion opposite to that reached by [the Supreme] Court on a question
9  of law or if the state court decides a case differently than [the] Court has on a set of materially
10 indistinguishable facts." Williams, 529 U.S. at 412–13; see also Lockyer, 538 U.S. at 72. "The
11 word 'contrary' is commonly understood to mean 'diametrically different,' 'opposite in character
12 or nature,' or 'mutually opposed.'" Williams, 529 U.S. at 405 (quoting Webster's Third New
13 International Dictionary 495 (1976)). "A state-court decision will certainly be contrary to
14 [Supreme Court] clearly established precedent if the state court applies a rule that contradicts the
15 governing law set forth in [Supreme Court] cases." Id. If the state court decision is "contrary to"
16 clearly established Supreme Court precedent, the state decision is reviewed under the pre-
17 AEDPA de novo standard. Frantz v. Hazey, 533 F.3d 724, 735 (9th Cir. 2008) (en banc).

18 "Under the 'reasonable application clause,' a federal habeas court may grant the writ if
19 the state court identifies the correct governing legal principle from [the] Court's decisions but
20 unreasonably applies that principle to the facts of the prisoner's case." Williams, 529 U.S. at 413.
21 "[A] federal court may not issue the writ simply because the court concludes in its independent
22 judgment that the relevant state court decision applied clearly established federal law erroneously
23 or incorrectly. Rather, that application must also be unreasonable." Id. at 411; see also Lockyer,
24 538 U.S. at 75–76. The writ may issue only "where there is no possibility fair minded jurists
25 could disagree that the state court's decision conflicts with [the Supreme Court's] precedents."
26 Richter, 562 U.S. at 102. In other words, so long as fairminded jurists could disagree on the
27 correctness of the state court's decision, the decision cannot be considered unreasonable. Id. If
28 the Court determines that the state court decision is objectively unreasonable, and the error is not

structural, habeas relief is nonetheless unavailable unless the error had a substantial and injurious effect on the verdict. Brecht v. Abrahamson, 507 U.S. 619, 637 (1993).

The Court looks to the last reasoned state court decision as the basis for the state court judgment. Wilson v. Sellers, 138 S. Ct. 1188, 1192 (2018); Stanley v. Cullen, 633 F.3d 852, 859 (9th Cir. 2011). If the last reasoned state court decision adopts or substantially incorporates the reasoning from a previous state court decision, this Court may consider both decisions to ascertain the reasoning of the last decision. Edwards v. Lamarque, 475 F.3d 1121, 1126 (9th Cir. 2007) (en banc). "When a federal claim has been presented to a state court and the state court has denied relief, it may be presumed that the state court adjudicated the claim on the merits in the absence of any indication or state-law procedural principles to the contrary." Richter, 562 U.S. at 99. This presumption may be overcome by a showing "there is reason to think some other explanation for the state court's decision is more likely." Id. at 99–100 (citing Ylst v. Nunnemaker, 501 U.S. 797, 803 (1991)).

Where the state courts reach a decision on the merits but there is no reasoned decision, a federal habeas court independently reviews the record to determine whether habeas corpus relief is available under § 2254(d). Stanley, 633 F.3d at 860; Himes v. Thompson, 336 F.3d 848, 853 (9th Cir. 2003). "Independent review of the record is not de novo review of the constitutional issue, but rather, the only method by which we can determine whether a silent state court decision is objectively unreasonable." Himes, 336 F.3d at 853. While the federal court cannot analyze just what the state court did when it issued a summary denial, the federal court must review the state court record to determine whether there was any "reasonable basis for the state court to deny relief." Richter, 562 U.S. at 98. This Court "must determine what arguments or theories . . . could have supported, the state court's decision; and then it must ask whether it is possible fairminded jurists could disagree that those arguments or theories are inconsistent with the holding in a prior decision of [the Supreme] Court." Richter, 562 U.S. at 102.

///

///

///

## IV.

## REVIEW OF CLAIMS

In his sole claim for relief, Petitioner asserts ineffective assistance of trial counsel for failing to object to the prosecution's "introduction of evidence of an additional possible weapon" during closing argument. (ECF No. 1 at 5.[12]) Respondent argues that the "writ is barred because a fairminded jurist could concur with a state court finding of no prejudice. Independently, it is barred under de novo analysis of either prong." (ECF No. 11 at 8.)

This claim was raised on direct appeal to the California Court of Appeal, Fifth Appellate District, which denied the claim in a reasoned decision. The California Supreme Court summarily denied Petitioner's petition for review. As federal courts review the last reasoned state court opinion, the Court will "look through" the California Supreme Court's summary denial and examine the decision of the Tulare County Superior Court. See Wilson, 584 U.S. at 125.

In denying Petitioner's ineffective assistance of counsel claim, the California Court of Appeal stated:

**A.** *Additional Factual Background*

**1. Closing Arguments**

The prosecutor stated the following during his closing argument:

> "Last witness the defense called from the Department of Justice said the screwdrivers number 12, and screwdriver number 14 didn't have any victims' DNA on it, so it's not consistent with being stabbed with a screwdriver. That wasn't the defendant's screwdriver, ladies and gentlemen. That's a distraction.
>
> "Whose screwdriver was number 14? That was William's screwdriver right where he was jumping over the counter, firing his gun from. He came in armed with a screwdriver, fell out of his pocket. Orlando's screwdriver, Joe's screwdriver. Right next to him there in that picture, Exhibit 120. That was his screwdriver. The one that the defendant had he took with him when he fled. Again, distraction."

The prosecutor continued by arguing, "[T]hat's when William ... had jumped over the counter ... right next to the screwdriver that he dropped that he was carrying.

---

[12] Page numbers refer to ECF page numbers stamped at the top of the page.

Again, screwdriver 12 and 14, those weren't [defendant's] screwdrivers. That's a distraction."

Trial counsel stated the following during his closing argument:

> "And then the most important evidence in this case, the screwdrivers. So I gather from [the prosecutor's] argument that the plan as he sees it was to all three be armed with screwdrivers, which is a dumb plan. It's also completely fantasy and conjecture. There's not a single shred or piece of evidence that you heard from the witness stand that supports that. And that is evidence of how awful this case is. That's how awful this case is, because in order to tell a coherent story about what happened, they just have to make it up. Oh, yeah. There's a third screwdriver. He took it with him, obviously, because that's the only way the evidence fits. [¶] ... [¶]

> "[Detective] Sanchez testified that he sat through other hearings where Juan ... did the same thing. Nobody at any point at any part of this trial has said anything about a third screwdriver, much less anything about a second person, other than [defendant], being armed with a screwdriver. It's pure, pure fantasy. But it's the fantasy that you have to concoct in your [head] in order to fit the DA's theory together, because, folks, those screwdrivers had no blood on them, no fibers on them. They had no DNA significance on them. And you heard Sarah P[.], a scientist with the Department of Justice, tell you that's not consistent with a screwdriver that just stabbed somebody.

> "Juan ... planted that screwdriver there to support his story. That's what happened. He grabbed a screwdriver out of a drawer somewhere, threw it on the ground, and said 'Oh, they stabbed me with a screwdriver,' because there was absolutely no evidence to suggest that he was stabbed with a screwdriver. And the evidence that is on the scene does not in any way, shape, manner, or form corroborate. The only thing you can do is create a third screwdriver out of nowhere to make Juan['s] story fit.

> "And remember what happened we questioned about the screwdriver. I questioned Juan ... about the screwdriver. Is that the screwdriver? Yeah. That's the screwdriver. Show you previous where you've identified this as the screwdriver. Yes. That's [the] screwdriver.

> "Did the [prosecutor] ask any questions calling into question whether or not that was the screwdriver, saying hey, are you sure it was the screwdriver? Might there have been a different screwdriver? Did he ask any questions about the screwdriver of Juan ... ? No. What about when [Detective] Sanchez was up there and I was asking him, 'Hey, did Juan ... say anything about the screwdriver? Did he ask [Detective] Sanchez?' Well, was there any equivocalness – that's not a word – did he equivocate? Did he say maybe it was a different screwdriver? There was no questioning by the DA on the subject of the screwdriver and whether or not that was the screwdriver that, in fact, stabbed Juan ....

> "After Sarah [P.] testifies, though, there's got to have been a third screwdriver, man. Has to have been. That's how critically damning that piece of evidence is for this case. If you remember, two pieces of evidence when you go back in the jury room, the screwdrivers and the target phone.

>Absolutely demolish, devastate, and destroy the case that the DA is trying to present to you."

### 2. Proceedings After the Trial

Following the trial, trial counsel stated the following on the record, "Whatever the Court would like to do. I think it's abundantly clear that I rendered ineffective assistance in [defendant's] trial, and that needs to be addressed by other counsel." The trial court asked trial counsel if he in fact rendered ineffective assistance of counsel and trial counsel replied, "Yes."

At a subsequent *Marsden*[13] hearing, trial counsel stated:

> " ... I didn't miss what [the prosecutor] said about the fact that somebody brought in another screw driver. I got that loud and clear. What I missed was the fact that that argument is, in fact, misconduct by the prosecutor. And I missed the objection to that argument. So I argued it, because I had to argue it. However, it would have been to [defendant's] advantage clearly to have the Court sustain an objection, admonish the prosecutor, and instruct the jury to disregard that argument."

The trial court responded:

> "I think out of an abundance of caution, it probably would – in fairness to [defendant], it probably would be best – I'm not saying that I'm finding at this point what he did rose to the level of ineffective assistance of counsel; I want to make that clear on the record, because once – if that finding is made, then I have to report it to the State Bar and all that stuff. But out of an abundance of caution, I think it would be good to have another attorney take over this – she'll have to be appointed for all purposes."

New counsel then filed a motion for a new trial alleging both prosecutorial misconduct regarding the prosecutor's misstatements about the screwdrivers and ineffective assistance of counsel because trial counsel failed to object to these statements. The People then filed an opposition to defendant's motion for a new trial. At the motion for a new trial hearing, the trial court concluded:

> "And in analyzing this case, the Court does find that the district attorney did refer to facts that were not in evidence. And there were some mischaracterization. He stated that a screwdriver fell out of William['s] pocket, however, the Court could not find any such testimony and also made comment that [ ] defendant had a third screwdriver and took it with them.
>
> "And the Court does not find that these were reasonable inferences to be drawn from the evidence, and they're not the type of matters that would be considered common knowledge or illustrations drawn from common experience, history, or any sort of reasonable inference in the Court's mind. And frankly had an objection been made, I would have sustained it and admonished the jury."

However, the trial court concluded "in reviewing the closing arguments as whole, the screwdriver's [*sic*] were only part of the evidence [¶] [a]nd so as to the claim

---

[13] *People v. Marsden* (1970) 2 Cal.3d 118.

of constitutional due process violation, there's no pattern of conduct so egregious that it [infects] the trial with unfairness." Additionally, the trial court stated, "And as to the state claim, I don't find that this rises to the level of deception or reprehensible methods to persuade a jury[ ] [and] [w]hile I do find it to be improper argument, I do not find that it constitutes prosecutorial misconduct." Lastly, the trial court did not find ineffective assistance of counsel because trial counsel "did overall a very good job of representing [defendant]" and there was not "anything about his representation [that] fell below any objective standard of reasonableness." The trial court denied the motion for a new trial.

. . .

**C.** *Defendant has Failed to Establish Trial Counsel was Ineffective for Failing to Object to the Alleged Prosecutorial Misconduct*

Defendant acknowledges his claims of prosecutorial misconduct may have been forfeited because his trial counsel failed to object and request a jury admonishment. Therefore, in the alternative, defendant contends his trial counsel was ineffective for failing to object. As we shall explain, we reject defendant's claim for ineffective assistance of counsel.

### 1. Applicable Law

Defendant has the burden of proving ineffective assistance of counsel. (*People v. Pope* (1979) 23 Cal.3d 412, 425, overruled on other grounds in *People v. Berryman* (1993) 6 Cal.4th 1048.) To establish such a claim, a defendant must show (1) his counsel's performance fell below an objective standard of reasonableness and (2) but for counsel's error, a different result would have been reasonably probable. (*Strickland, supra*, 466 U.S. at pp. 687–688, 694; *People v. Ledesma* (1987) 43 Cal.3d 171, 216–218.) "A reasonable probability is a probability sufficient to undermine confidence in the outcome." (*Strickland*, at p. 694.)

"Because of the difficulties inherent in making the evaluation [of counsel's performance], a court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance; ... the challenged action 'might be considered sound trial strategy.' " (*Strickland, supra*, 466 U.S. at p. 689.) Moreover, " ' " 'a court need not determine whether counsel's performance was deficient before examining the prejudice suffered by the defendant as a result of the alleged deficiencies.' " ' " (*People v. Holt* (1997) 15 Cal.4th 619, 703.)

### 2. Analysis

Even if trial counsel's failure to object fell below an objective standard of reasonableness, there was not a reasonable probability that the result of the proceeding would have been different but for counsel's deficient performance. (*Strickland, supra*, 466 U.S. at pp. 687–688.) First, there was ample evidence to establish defendant guilty of robbery and burglary against Juan. Apart from Juan's testimony about the robbery and burglary, Tiffany testified that William, defendant, and defendant's little brother were all together before the crimes and stopped in a residential neighborhood. At or around the time the robbery and burglary occurred Tiffany heard what she believed to be "[e]ither gunshots or fireworks" and then observed William run back into the car with a wad of cash and frantically state, " '[M]ove, move, move' " and " '[t]he house lick went bad.'

11

" Later, William told Tiffany to remove a piece of paper covering the entire license plate, which she ended up doing.

Subsequently, law enforcement arrived and located a "wad or bundle of cash in the middle of the lawn," a .45-caliber handgun, and evidence of use of a nine-millimeter handgun, Orlando dead in the kitchen on top of a rifle, pools of blood leading out to the garage, and two screwdrivers, one with a shaved tip. All this evidence corroborated the testimony surrounding the robbery and burglary. The jury may have believed Juan's testimony because of this corroborating evidence, irrespective of his credibility issues.

Second, the jury was properly instructed they alone were to judge the evidence and determine whether defendant was guilty beyond a reasonable doubt. (See *People v. Pearson* (2013) 56 Cal.4th 393, 414 ["We presume that jurors understand and follow the court's instructions"].) The trial court instructed the jury, "[y]ou must decide what the facts are [ ] [and] [i]t is up to all of you, and you alone to decide what happened based only on the evidence that has been presented to you in this trial" (CALCRIM 200) and " '[e]vidence' is the sworn testimony of witnesses, the exhibits admitted into evidence, and anything else [the trial court] told you to consider as evidence ... [and] [i]n their opening statements and closing arguments, the attorneys discuss the case, *but their remarks are not evidence*" (CALCRIM No. 222). (Italics added.) Lastly, the jury was instructed that "[i]n deciding whether the People have proved their case beyond a reasonable doubt, you must impartially compare and consider all evidence that was received throughout the entire trial" (CALCRIM No. 220). Accordingly, even assuming trial counsel's performance did fall below an objective standard of reasonableness, it was not reasonably probable defendant would have obtained a different result.

Hernandez, 2022 WL 17076562, at *6–10 (footnote in original).

The clearly established federal law governing ineffective assistance of counsel claims is Strickland v. Washington, 466 U.S. 668 (1984). In a petition for writ of habeas corpus alleging ineffective assistance of counsel, the court must consider two factors. Id. at 687. First, the petitioner must show that counsel's performance was deficient, requiring a showing that counsel made errors so serious that he or she was not functioning as the "counsel" guaranteed by the Sixth Amendment. Strickland, 466 U.S. at 687. The petitioner must show that counsel's representation fell below an objective standard of reasonableness and must identify counsel's alleged acts or omissions that were not the result of reasonable professional judgment considering the circumstances. Richter, 562 U.S. at 105 ("The question is whether an attorney's representation amounted to incompetence under 'prevailing professional norms,' not whether it deviated from best practices or most common custom." (citing Strickland, 466 U.S. at 690)). Judicial scrutiny of counsel's performance is highly deferential. A court indulges a strong

1  presumption that counsel's conduct falls within the wide range of reasonable professional
2  assistance. Strickland, 466 U.S. at 687. A reviewing court should make every effort "to eliminate
3  the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged
4  conduct, and to evaluate the conduct from counsel's perspective at that time." Id. at 689.

5  Second, the petitioner must show that there is a reasonable probability that, but for
6  counsel's unprofessional errors, the result would have been different. It is not enough "to show
7  that the errors had some conceivable effect on the outcome of the proceeding." Strickland, 466
8  U.S. at 693. "A reasonable probability is a probability sufficient to undermine confidence in the
9  outcome." Id. at 694. A court "asks whether it is 'reasonable likely' the result would have been
10 different. . . . The likelihood of a different result must be substantial, not just conceivable."
11 Richter, 562 U.S. at 111–12 (citing Strickland, 466 U.S. at 696, 693). A reviewing court may
12 review the prejudice prong first. See Pizzuto v. Arave, 280 F.3d 949, 955 (9th Cir. 2002).

13 When § 2254(d) applies, "[t]he pivotal question is whether the state court's application of
14 the Strickland standard was unreasonable. This is different from asking whether defense
15 counsel's performance fell below Strickland's standard." Richter, 562 U.S. at 101. Moreover,
16 because Strickland articulates "a general standard, a state court has even more latitude to
17 reasonably determine that a defendant has not satisfied that standard." Knowles v. Mirzayance,
18 556 U.S. 111, 123 (2009) (citing Yarborough v. Alvarado, 541 U.S. 652, 664 (2004)). "The
19 standards created by Strickland and § 2254(d) are both 'highly deferential,' and when the two
20 apply in tandem, review is 'doubly' so." Richter, 562 U.S. at 105 (citations omitted). Thus, "for
21 claims of ineffective assistance of counsel . . . AEDPA review must be 'doubly deferential' in
22 order to afford 'both the state court and the defense attorney the benefit of the doubt.'" Woods v.
23 Donald, 575 U.S. 312, 316–17 (2015) (quoting Burt v. Titlow, 571 U.S. 12, 15 (2013)). When
24 this "doubly deferential" judicial review applies, the inquiry is "whether there is any reasonable
25 argument that counsel satisfied Strickland's deferential standard." Richter, 562 U.S. at 105.

26 Petitioner argues that "this case is entirely circumstantial" and "[t]he only evidence
27 linking [Petitioner] to the case is the victims [sic] statements," and thus, the prosecutor referring
28 to facts not in evidence prejudiced Petitioner. (ECF No. 12 at 2.) As noted by the state court,

Tiffany testified that William, Petitioner, and Petitioner's little brother were all together before the crimes and stopped in a residential neighborhood. At or around the time the robbery and burglary occurred, Tiffany heard either gunshots or fireworks, observed William run back into the car with a wad of cash, and heard him state that the house robbery went bad. Additionally, the physical evidence at the house (e.g., cash on the lawn, a .45-caliber handgun, nine-millimeter casings, Orlando dead in the kitchen on top of a rifle, pools of blood leading out to the garage, and two screwdrivers, one with a shaved tip) corroborated Juan's testimony. Moreover, the jury was specifically instructed: "'Evidence' is the sworn testimony of witnesses, the exhibits admitted into evidence, and anything else I told you to consider as evidence. Nothing that the attorneys say is evidence. In their opening statements and closing arguments, the attorneys discuss the case, but their remarks are not evidence." (1 CT 196.) "[U]nder Supreme Court precedent, a jury is presumed to follow the trial court's instructions." Deck v. Jenkins, 814 F.3d 954, 979 (9th Cir. 2016) (citing Weeks v. Angelone, 528 U.S. 225, 234 (2000)). Petitioner presents no evidence suggesting that the jury departed from the trial court's instructions.

"All that matter[s] [i]s whether the [state] court, notwithstanding its substantial 'latitude to reasonably determine that a defendant has not shown prejudice' still managed to blunder so badly that every fairminded jurist would disagree." Mays v. Hines, 592 U.S. 385, 392 (2021) (original alterations and emphasis omitted) (quoting Knowles v. Mirzayance, 556 U.S. 111, 123 (2009)). Based on the foregoing, it was not objectively unreasonable for the state court to find that Petitioner had not demonstrated there was a reasonable probability that the result of the proceeding would have been different if counsel had objected to the prosecutor's alleged misconduct. Accordingly, Petitioner is not entitled to habeas relief for ineffective assistance of counsel.

## V.

## RECOMMENDATION

Based on the foregoing, the Court HEREBY RECOMMENDS that the petition for writ of habeas corpus be DENIED.

///

This Findings and Recommendation is submitted to the assigned United States District Court Judge, pursuant to the provisions of 28 U.S.C. § 636 (b)(1)(B) and Rule 304 of the Local Rules of Practice for the United States District Court, Eastern District of California. Within **THIRTY (30) days** after service of the Findings and Recommendation, any party may file written objections with the court and serve a copy on all parties. Such a document should be captioned "Objections to Magistrate Judge's Findings and Recommendation." Replies to the objections shall be served and filed within fourteen (14) days after service of the objections. The assigned District Judge will then review the Magistrate Judge's ruling pursuant to 28 U.S.C. § 636(b)(1)(C). The parties are advised that failure to file objections within the specified time may waive the right to appeal the District Court's order. Wilkerson v. Wheeler, 772 F.3d 834, 839 (9th Cir. 2014) (citing Baxter v. Sullivan, 923 F.2d 1391, 1394 (9th Cir. 1991)).

IT IS SO ORDERED.

Dated:   **August 22, 2024**

UNITED STATES MAGISTRATE JUDGE